1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    DANIEL CHUNG,                          Case No.  21-cv-07583-WHO

8                 Plaintiff,

9          v.                               ORDER GRANTING IN PART AND
                                            DENYING IN PART MOTION TO
10   COUNTY OF SANTA CLARA, et al.,         DISMISS

11                Defendants.               Re: Dkt. No. 48

12

13          Defendants Santa Clara County ("the County") and Jeffrey Rosen, the County's district

14   attorney (collectively, "the defendants"), again move to dismiss this section 1983 lawsuit brought

15   by former deputy district attorney Daniel Chung, who alleges that his First Amendment rights

16   were violated when he was retaliated against after writing an opinion piece that was published in a

17   local newspaper.  The motion to dismiss is GRANTED in part and DENIED in part with leave to

18   amend.  Chung has adequately alleged that he spoke as a private citizen rather than a public

19   employee—at least to survive the motion to dismiss.  But he has not sufficiently pleaded the claim

20   against either defendant.  Chung did not show a custom, policy, or practice to establish *Monell*

21   liability against the County.  His allegations regarding Rosen's individual liability are too

22   conclusory to proceed, but it appears from his briefing that he could add additional facts to make

23   his claim plausible.  I will give Chung the opportunity to do so.

24                                   **BACKGROUND**

25          On February 14, 2021, Chung, who then worked as a deputy district attorney for Santa

26   Clara County, published an opinion piece in a local newspaper about a "recent surge of racism and

27   violence towards Asian Americans following the COVID-19 pandemic."  First. Am. Compl.

28

1    ("FAC") [Dkt. No. 41] ¶¶ 1, 16.[1]  The op-ed "discussed California's ongoing criminal justice

2    reform efforts and the violence against Asian Americans in the Bay Area."  *Id*. ¶ 16.  The piece

3    did not specifically mention Santa Clara County, the district attorney's office, the district attorney,

4    or any investigation or proceeding in which Chung was actively participating.  *Id*. ¶¶ 17-18.

5    Rather, Chung "referenced generally his experience as a prosecutor."  *Id*. ¶ 17.  He states that he

6    did not write the italicized statement at the end of the piece that identified him as a Santa Clara

7    County deputy district attorney.  *Id*. ¶ 17 n.1.

8          Chung alleges that he was "wrongfully disciplined for his op-ed piece" after it was

9    published.  *Id*. ¶ 20.  He was reassigned from the "highly regarded and much sought after" Violent

10   Felonies Unit to Mental Health Court and then to Juvenile Justice, assignments "generally

11   considered less prestigious."  *Id*. ¶¶ 15, 20.  In mid-April 2021, he was suspended for two weeks.

12   *Id*. ¶ 21.  In late May, he was placed on administrative leave and was "walked out of the district

13   attorney's office by three armed investigators."  *Id*. ¶ 22.  On May 31, 2021, a "be on the lookout"

14   notice with his photo was sent to the office's staff, stating that "DDA Chung is not allowed on

15   County property until further notice."  *Id*. ¶ 23.  A second notice was issued a few days later.  *Id*. ¶

16   24. On June 11, Chung was suspended for two weeks without pay.  *Id*. ¶ 25.  The FAC alleges

17   that Rosen authorized or ratified all of these actions or, alternatively, acted with deliberate

18   indifference to the actions of executive staff members and others, and failed to investigate and

19   remedy their unlawful actions.  *See id*. ¶¶ 20-26.

20         Chung filed suit on September 28, 2021, bringing a single cause of action under 42 U.S.C.

21   § 1983 alleging that the County and Rosen violated his First Amendment rights by retaliating

22   against him for his speech.  *See* Dkt. No. 1.  On February 23, 2022, I granted the defendants'

23   motion to dismiss, as Chung did not expressly plead that he was speaking as a private citizen nor

24   adequately allege liability against either defendant.  *See* Dkt. No. 37.  Chung filed his FAC on

25   March 9, 2022, which the defendants moved to dismiss on April 13.  Dkt. Nos. 41, 48.

26

27   [1] The FAC attaches and incorporates by reference the opinion piece.  *See* FAC, Ex. A; *see also*
     *Tunac v. United States*, 897 F.3d 1197, 1207 n.8 (9th Cir. 2018) ("[a] document is incorporated
28   when its contents are described and the document is integral to the complaint") (citation and
     quotation marks omitted).

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *See Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the court accepts his allegations as true and draws all reasonable inferences in his favor. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

If the court dismisses the complaint, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *See Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). In making this determination, the court should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *See Moore v. Kayport Package Express*, 885 F.2d 531, 538 (9th Cir. 1989).

**DISCUSSION**

**I.      REQUESTS FOR JUDICIAL NOTICE**

The defendants attached several exhibits to their motion to dismiss, which they argue that I may consider either because they are incorporated by reference into the FAC or because they are appropriate for judicial notice. Those documents include:

(1) Emails between Chung and a reporter and the editorial page editor of the Bay

3

Area News Group;

(2) An excerpt of the Santa Clara County District Attorney's Office Policy and Procedure Manual;

(3) Excerpts of the Santa Clara County Charter;

(4) Excerpts of the Santa Clara County Ordinance Code; and

(5) A copy of a February 5, 2021, article published in the San Jose Mercury News. *See* Mot. to Dismiss ("MTD") [Dkt. No. 48] Goodwin Decl., Ex. 1; Defs. Req. for Judicial Notice ("Defs. RJN") [Dkt. No. 49] Exs. A-D.

A court generally may not consider "any material beyond the pleadings" when deciding a motion brought under Rule 12(b)(6). *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001), *overruled on other grounds by Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002). Otherwise, the motion to dismiss is converted into one for summary judgment. *See* Fed. R. Civ. P. 12(d). There are, however, two exceptions to the general rule. The court may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

**A. Incorporation by Reference**

"Although mere mention of the existence of a document is insufficient to incorporate the contents of a document, the document is incorporated when its contents are described and the document is integral to the complaint." *Tunac*, 897 F.3d at 1207 n.8. The defendants argue that Chung incorporated the emails into the complaint by reference and warrant my consideration in deciding this motion. *See* MTD at 7 n.1. They contend that Chung's claim that he spoke as a private citizen depends on the emails, as he allegedly "told the newspaper that the opinion piece stated only his personal views," did not "refer to his title as Santa Clara County Deputy District Attorney," and "did not write" or include his title at the end of the piece. *See id.* (citing FAC ¶¶ 16-17).

The FAC does not mention the emails, let alone incorporate them. The FAC alleges that Chung "told" the newspaper that the piece stated his personal views. *See* FAC ¶ 16. But he does not allege that he told them this via email. *See id.* Nor does he describe the contents of the email

1  exchange with any level of detail.  *See generally* FAC.  This is a far cry from the emails that the

2  court deemed incorporated by reference in *Promise Public Schools, Inc. v. San Jose Unified*

3  *School District*, No. 20-CV-08555-CRB, 2021 WL 916903, at *5 n.5 (N.D. Cal. Mar. 10, 2021).

4  There, the plaintiff alleged "[t]hroughout its complaint" that it accepted a final offer and entered

5  into a valid contract, and "reference[d] the specific emails that defendants . . . attached in doing

6  so." *Promise Pub. Schs.*, 2021 WL 916903, at *5 n.5.  Chung does not reference the emails at

7  issue nor make allegations about their contents throughout the complaint.  *See generally* FAC.

8        The emails are not integral to Chung's claim.  To be sure, the claim's sufficiency depends

9  on whether he was speaking as a public employee or private citizen, as I explain in greater detail

10  below.  The emails may assist in answering that question—either because, as the defendants argue,

11  they show that Chung used his position as a deputy district attorney to secure publication and sent

12  the op-ed to the newspaper from his work email address during work hours, or, as Chung asserts,

13  because they show that he told the newspaper that the piece stated only his personal views.  *See*

14  MTD at 7:1-8; FAC at ¶ 16.  But Chung's claim does not rise and fall with the emails.  Courts

15  look to the scope and content of a person's job responsibilities in deciding whether a person spoke

16  as a private citizen or a public employee.  *See Eng v. Cooley*, 552 F.3d 1062, 1071 (9th Cir. 2009).

17  The emails on their own are not dispositive of the scope and content of Chung's responsibilities as

18  a deputy district attorney.

19        Because the FAC does not reference any of the emails at issue nor describe their contents,

20  and because the emails are not integral to the claim, they are not incorporated by reference under

21  *Tunac*.  897 F.3d at 1207 n.8.  I will not consider them on this motion to dismiss.

22        **B.  Requests for Judicial Notice**

23        A court "may judicially notice a fact that is not subject to reasonable dispute because it:

24              (1) is generally known within the trial court's territorial jurisdiction; or

25              (2) can be accurately and readily determined from sources whose accuracy cannot
26                  reasonably be questioned."

27  Fed. R. Evid. 201(b).  I will take notice of the excerpts of the County Charter and Ordinance Code

28  provided by the defendants and Chung in his own request for notice.  Defs RJN, Exs. B-C; Pl's.

RJN [Dkt. No. 56] Ex. A; Defs. Suppl. RJN [Dkt. No. 58-1] Ex. I.  The facts within them can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. *See* Fed. R. Evid. 201(b)(2); *see also Madani v. Cty. of Santa Clara*, No. 16-CV-07026-LHK, 2017 WL 1092398, at *4 (N.D. Cal. Mar. 23, 2017) (taking judicial notice of the same documents).

I will also take notice of the excerpt of the Santa Clara County District Attorney's Office Policy and Procedure Manual for the same reason.  Defs. RJN, Ex. A.  Chung argues that I should not because "its existence and contents are not relevant to" the motion's determination.  Oppo. to Defs. RJN [Dkt. No. 55] 1:20-23.  I disagree.  Though not dispositive, the proffered excerpt is relevant to whether Chung's duties as a deputy district attorney included speaking to the press and whether there was any distinction within that duty.  Courts may take notice of department policies. *See, e.g., Foster v. City of Oakland*, 621 F. Supp. 2d 779, 795 (N.D. Cal. 2008) (taking notice of police department strip search policies).

I will not take notice of the February 5, 2021, Mercury News article, or the emails related to a public information request by Chung.  Defs. RJN, Ex. D; Defs. Suppl. RJN, Exs. F-H.  The facts within them are not relevant to the motion at hand.  Courts may take notice of adjudicative facts, but adjudicative facts must be relevant. *See* Fed R. Evid. 201; *see also Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1000 n.5 (9th Cir. 2018).  A comment that Chung previously made to a newspaper, and his efforts to obtain public records, are not relevant to whether he has sufficiently alleged a First Amendment retaliation claim against the County or Rosen.

## II.    FIRST AMENDMENT CLAIM

Section 1983 creates a cause of action for violations of the federal Constitution and laws by officials acting under the color of law.  42 U.S.C. § 1983.  It is not a standalone source of substantive rights; rather, it provides a "method for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979).

"It has been well accepted for more than fifty years that public employees have First Amendment rights to speak out on matters of public interest and concern, so long as the speech does not interfere with the legitimate and orderly administration of government operations."

*Ohlson v. Brady*, 9 F.4th 1156, 1157-58 (9th Cir. 2021) (citing cases).  Courts utilize what became known as the *Pickering* test to balance a public employee's interest in commenting on matters of public concern and the state's interest as an employer in promoting efficient public service.  *See id.* at 1162.  *Pickering* offers a "sequential five-step series of questions:

> (1) whether the plaintiff spoke on a matter of public concern;
>
> (2) whether the plaintiff spoke as a private citizen or public employee;
>
> (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action;
>
> (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and
>
> (5) whether the state would have taken the adverse employment action even absent the protected speech."

*Eng*, 552 F.3d at 1070.  The burden is on the plaintiff to show the first three steps; it then shifts to the government.  *See id.* at 1070-72.

The parties dispute only the second element: whether Chung spoke as a private citizen or as a public employee in his op-ed.  *See* MTD at 3:24-25; Oppo. [Dkt. No. 54] 8:13-18.  The distinction is critical—the Supreme Court has held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).

When determining the scope of an employee's duties, the Court expressly rejected the suggestion that "employers can restrict employees' rights by creating excessively broad job descriptions." *Id.* at 424.  Rather, the Court held

> The proper inquiry is a practical one.  Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

*Id.* at 424-25.  As the Court later clarified,

> the mere fact that a citizen's speech concerns information acquired by virtue of his

  
> public employment does not transform that speech into employee—rather than
> citizen—speech.  The critical question under *Garcetti* is whether the speech at issue
> is itself ordinarily within the scope of an employee's duties, not whether it merely
> concerns those duties.

*Lane v. Franks*, 573 U.S. 228, 240 (2014).

After *Garcetti*, the Ninth Circuit announced three "guiding principles" for undertaking this practical inquiry.  *Brandon v. Maricopa Cty.*, 849 F.3d 837, 843 (9th Cir. 2017).  They are: (1) whether the employee "confined his communications to his chain of command" (if not, "it is unlikely that he is speaking pursuant to his duties"); (2) the subject matter of the communication (for example, routine reports prepared according to normal departmental procedure are typically within the employee's job duties, unlike statements about "broad concerns about corruption or systemic abuse"); and (3) whether the employee spoke "in direct contravention to his supervisor's orders" (if so, that speech may be beyond his professional duties).  *Dahlia v. Rodriguez*, 735 F.3d 1060, 1074-76 (9th Cir. 2013).

"While the question of the scope and content of a plaintiff's job responsibilities is a question of fact, the ultimate constitutional significance of the facts as found is a question of law." *Eng*, 552 F.3d at 1071 (citation and quotation marks omitted).  The court must "therefore assume the truth of the facts as alleged by the plaintiff with respect to employment responsibilities."  *Id*. "If the allegations demonstrate an official duty to utter the speech at issue, then the speech is unprotected."  *Id*.

The FAC alleges that Chung was speaking as a private citizen in the op-ed, not in his capacity as a deputy district attorney.  FAC ¶ 16.  At the time he wrote the piece, Chung alleges that his official duties did not include writing opinion pieces or providing commentary to local newspapers.  *Id*. ¶ 19.  Although he was allowed to respond to media inquiries "about cases he was handling where a complaint had been filed," Chung alleges that he was "not required to communicate with the media or news organizations regarding matters of general public concern as part of his regular job duties."  *Id*.  The op-ed, the FAC alleges, "was not in response to a media inquiry."  *Id*.

The defendants argue that Chung failed to allege that he spoke as a private citizen for

several reasons.  Two of those arguments—that Chung used his work title and resources to secure publication, and that his attempted disclaimer did not transform the op-ed into private speech—depend on Chung's emails to and from the Mercury News.  *See* MTD at 7:1-9:1, 11:26-12:27.  Because the emails were not incorporated by reference into the FAC, I will not consider any arguments that rely on them in deciding this motion.

Turning to the remaining points, the defendants first argue that communicating with the press was part of Chung's official duties.  *See id.* at 4:15.  They rely heavily on *Brandon*, which involved a county attorney who spoke to a newspaper reporter about the county's settlement of a case that she was handling a specific case she was handling and suggested that she disagreed with the county's settlement of that case.  *See* 849 F.3d at 840, 845.  The Ninth Circuit held that the attorney had a "broad fiduciary duty to her client—the county," and that Arizona's rules of professional conduct for lawyers anticipated public statements made to the press to be part of an attorney's duties in representing her client.  *See id.* at 845.  Under that framework, the court held that the attorney's comments "fell under [her] broad set of official duties" and were not constitutionally protected, in part because: (1) "she was inevitably speaking as a lawyer representing the county as her public statements touched on the very matter on which she represented the county"; and (2) they "reflected negatively on her client."  *See id.* at 845-46.  The defendants argue that, like the professional rules in Arizona, the California Rules of Professional Conduct, along with section 5.01(b)(iv)(3) of the D.A. Policy and Procedure, contemplate that a deputy district attorney's duties include making statements to the media.  MTD at 6:3-10.

Chung does not dispute that his duties as a deputy district attorney included some amount of communication with the press.  Oppo. at 11:5-15.  Rather, he argues, the FAC distinguishes between responding to media inquiries "about cases he was handling where a complaint had been filed" and communicating with the press "regarding matters of general public concern."  *See id.* (citing FAC ¶ 19).  He contends that because the op-ed was not in response to a media inquiry and because his official duties did not include writing opinion pieces or providing commentary to local newspapers, he has sufficiently alleged that he was speaking as a private citizen.  *See id.* (citing FAC ¶ 19).

1   Chung has the better argument—at least at this stage of the litigation.  *Brandon* is

2   distinguishable because the attorney there was responding to a reporter's question about a specific

3   case she was handling, then suggested her disagreement with how that case was resolved.  *See* 849

4   F.3d at 840.  As alleged, Chung's op-ed was not in response to a media inquiry, nor did it discuss

5   any cases or investigations that he actively participated in.  *See* FAC ¶¶ 18-19.

6   The defendants are correct that the California Rules of Professional Conduct anticipate an

7   attorney's statements to the press.  *See* MTD at 6:3-5.  But Rule 3.6 (along with the reference to

8   Rule 3.6 in Rule 3.8) contemplates those comments in the context of a specific investigation or

9   case.  *See* Cal. Rule Prof. Conduct 3.6(b), 3.8(e).  This is evident throughout the text of the rule,

10   which discusses "a substantial likelihood of materially prejudicing an adjudicative proceeding in

11   the matter" and outlines the basic information an attorney may publicly share, such as "the claim,

12   offense or defense involved" and "the scheduling or result of any step in litigation."  *See* Cal. Rule

13   Prof. Conduct 3.6.  Again, Chung's op-ed did not discuss any case he was handling.

14   The judicially noticed section of the Policy and Procedure Manual is not particularly

15   helpful.  It shows that attorneys may be "assigned a speaking engagement or presentation project"

16   by her supervisor or may be approved to "speak to a group," and "speaks as an official

17   representative of the district attorney's office" when doing so.  *See* Defs. RJN, Ex. A.  But it also

18   states that an "attorney who speaks to a group or organization without the prior approvals . . . must

19   do so as a private person."  *See id*.  Rather than show that Chung's official duties may include

20   providing commentary to the media, as the defendants argue, this particular section merely

21   distinguishes between circumstances where an attorney speaks on behalf of the office and those

22   where she speaks as a private citizen.  *See* MTD at 6:6-15.

23   The FAC draws a distinction similar to that in *Hardin v. Mendocino Coast District*

24   *Hospital*, No. 17-CV-05554-JST, 2018 WL 6331009, at *1-2 (N.D. Cal. Dec. 4, 2018).  There, the

25   Hon. Jon S. Tigar held that the plaintiff sufficiently pleaded a First Amendment retaliation claim

26   because the speech at issue—reporting potentially illegal practices—did not fall within her job

27   duties as a chief human resources officer, which were to develop and execute human resource

28   strategy.  *Hardin*, 2018 WL 6331009, at *2.  Judge Tigar noted that although "[i]t might appear

United States District Court
Northern District of California

10

unlikely that the job duties of a chief human resources officer would not include reporting potentially illegal human resources practices . . . at this stage of the proceedings, the court must construe the pleadings in a light most favorable to [the plaintiff] and accept as true [her] factual allegation that her job responsibilities did not include opposing [the defendant's] illegal practices." *Id*.

The same is true here.  Whether Chung's duties as a deputy district attorney in fact aligned with the distinction he alleges—i.e., whether they included responding to media inquiries about specific cases but not writing opinion pieces or providing commentary to local newspapers about matters of general concern—will be proven at a later stage of litigation.  At this point, I must accept his allegations as true and draw all reasonable inferences in his favor.  *See Usher*, 828 F.2d at 561.  Chung has sufficiently pleaded that he spoke as a private citizen in the op-ed.

Next, the defendants argue that Chung spoke as a public employee because the op-ed "discusses matters of which he has specialized knowledge gained through his public employment."  MTD at 9:2-7.  They point to certain phrases within the op-ed, in which Chung describes himself as a "proud criminal prosecutor" who specialized in violent crimes, opines that "[u]nder existing California law, this suspect would likely be eligible for mental health diversion," asserts that "[t]he mental health diversion statutory scheme is so loose in California," and claims that mental health diversion "can take place over the objection of prosecutors" and "does not require judges to hear from and consider the preferences of victims."  *Id*. at 9:22-10:8 (citing FAC, Ex. A).  According to the defendants, these statements "necessarily rely on [Chung's] specialized experience as a prosecutor and information not readily available to an ordinary private citizen."  *Id*. at 10:9-11.  Even if Chung did not reference one of his own active cases, they contend, his statements "relied on his public employment experience and duties in prior investigations or prosecutions."  *Id*. at 10:24-28.

The "mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech."  *Lane*, 573 U.S. at 240.  The Supreme Court has long recognized the public's interest in hearing the "well-informed views of government employees engaging in civic discussion."  *See Garcetti*, 547

U.S. at 419; *see also Pickering v. Board of Educ.*, 391 U.S. 563, 572 (1968) (holding that it was "essential" that teachers be able to speak freely about school funding because they are "the members of a community most likely to have informed and definite opinions" as to how that money should be spent). As the Court stated in *Lane*, "speech by public employees on subject matter related to their employment holds special value precisely because those employees gain knowledge of matters of public concern through their employment." 573 U.S. at 240. As a prosecutor, Chung certainly had a unique vantage point on criminal justice reform—a matter of public concern. His speech, via the op-ed, held the same special value as did the speech in *Pickering* and *Lane*.

The cases that the defendants rely upon do not compel a different conclusion. *See* MTD at 9:8-11:25 (citing *Weintraub v. Board of Educ.*, 593 F.3d 196 (2d Cir. 2010); *Sacha v. Sedita*, No. 09-CV-1119S, 2012 WL 5207528 (W.D.N.Y. Oct. 22, 2012); *Foley v. Town of Randolph*, 598 F.3d 1 (1st Cir. 2010)). None of these decisions are binding, as they are from courts beyond this circuit. Nor are they persuasive, as each is distinguishable.

In *Foley*, the First Circuit held that a fire chief was speaking as a public employee when, after a press conference about a fire, he made remarks about a proposition's "impact on the budget and staffing needs of the Fire Department"—a subject the court determined was "entirely related to matters concerning the Fire Department." 598 F.3d 8-9. In *Weintraub*, the speech at issue was a grievance that a teacher filed challenging a decision not to discipline a student who repeatedly threw books at him. 593 F.3d 198-99. The Second Circuit held that the grievance was pursuant to the teacher's official duties because it was "part-and-parcel of his concerns about his ability to properly execute his duties as a public school teacher—namely, to maintain classroom discipline." *Id*. at 203 (citation and quotation marks omitted). And in *Sacha*, the district court held that an assistant district attorney spoke as a public employee when he issued a statement to the press that expressly referenced his position and experience and stated his belief that charges should have been filed following an investigation that he led. *See* 2012 WL 5207528, at *5-7. In each of these cases, the public employee spoke about specific occurrences within their workplaces. Chung's op-ed broadly discusses criminal justice reform—not how his office was impacted by those reforms,

1    not about his ability to execute his duties, and not about how specific investigations by his office

2    should have been handled.

3          Finally, taking the principles articulated in *Dahlia* into account, Chung has sufficiently

4    pleaded that he spoke as a private citizen.  His speech was not confined to his chain of command,

5    as it was published in a newspaper.  *See Dahlia*, 735 F.3d at 1074 ("When a public employee

6    communicates with individuals or entities outside of his chain of command, it is unlikely that he is

7    speaking pursuant to his duties.").  The op-ed raised "broad concerns" about criminal justice

8    reform.  *See id*. at 1075 ("[I]f a public employee raises within the department broad concerns

9    about corruption or systemic abuse, it is unlikely that such complains can reasonably be classified

10   as being within the job duties of an average public employee. . .").  And Chung effectively alleges

11   that he was "harassed by his superiors" for his speech, which "provides strong evidence that the

12   act of speech was not, as a 'practical' matter, within the employee's job duties."  *Id*.

13         In sum, Chung has sufficiently pleaded that he spoke as a private citizen rather than a

14   public employee.  The alleged distinction in his duties to speak to the press is critical, as is the

15   Supreme Court's holding in *Lane* regarding speech acquired by virtue of public employment.  The

16   *Dahlia* principles also tip in Chung's favor.

17   **III.    *MONELL* LIABILITY**

18         Local governments may not be sued under section 1983 for injuries inflicted solely by their

19   employees or agents.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  However,

20   municipalities may be held liable under section 1983 when an official policy or custom causes a

21   constitutional violation.  *Id*. at 690-91.  A plaintiff must plausibly plead the following to proceed

22   with a *Monell* claim: "(1) that [he] possessed a constitutional right of which he was deprived; (2)

23   that the municipality had a policy, custom, or practice; (3) that the policy, custom, or practice

24   amounted to deliberate indifference to [his] constitutional rights; and (4) that the policy, custom or

25   practice was the moving force behind the constitutional violation."  *Torres v. Saba*, No. 17-CV-

26   06587-SI, 2019 WL 111039, at *6 (N.D. Cal. Jan. 4, 2019).  A plaintiff must allege sufficient facts

27   regarding the specific nature of the alleged policy, custom, or practice to allow the defendant to

28   effectively defend itself; merely alleging that a policy, custom, or practice existed is not enough.

United States District Court
Northern District of California

1    *See AE ex rel. Hernandez v. Cty. of Tulare*, 666 F.3d 631, 636-68 (9th Cir. 2012).

2          "There are three ways to show a policy or custom of a municipality: (1) by showing a

3    longstanding practice or custom which constitutes the 'standard operating procedure' of the local

4    government entity; (2) by showing that the decision-making official was, as a matter of state law, a

5    final policymaking authority whose edits or acts may fairly be said to represent official policy in

6    the area of decision; or (3) by showing that an official with final policymaking authority either

7    delegated that authority to, or ratified the decision of, a subordinate."  *Menotti v. City of Seattle*,

8    409 F.3d 1113, 1147 (9th Cir. 2005) (quotation marks omitted).

9          **A.  Longstanding Practice or Custom**

10          For a practice or custom to function as an entity's standard operating procedure, it "must

11    be so 'persistent and widespread' that it constitutes a 'permanent and well settled city policy.  *See*

12    *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (citing *Monell*, 436 U.S. at 691).  "Liability for

13    improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon

14    practices of sufficient duration, frequency, and consistency that the conduct has become a

15    traditional method of carrying out policy."  *Id*. (citations omitted).  "[O]ne or two incidents

16    ordinarily cannot establish a policy or custom, while more incidents may permit the inference of a

17    policy, taking into account their similarity, their timing, and subsequent actions by the

18    municipality."  *J.M. by and through Rodriguez v. Cty. of Stanislaus*, No. 18-CV-01034, 2018 WL

19    5879725, at *5 (E.D. Cal. Nov. 7, 2018); *see also Garcia v. Cty. of Napa*, No. 21-CV-03519-HSG,

20    2022 WL 110650, at *5 (N.D. Cal. Jan. 12, 2022) (holding that the plaintiffs did not sufficiently

21    plead a custom or practice because the allegations related to a single shooting); *Bagley v. City of*

22    *Sunnyvale*, No. 16-CV-02250-LHK, 2017 WL 344998, at *15 (N.D. Cal. Jan. 24, 2017) (similar).

23          The defendants argue that Chung does not plausibly plead any longstanding practice or

24    custom of retaliation for speech for two reasons.  First, they contend that the two incidents alleged

25    in the FAC—involving Chung and another deputy district attorney, James Sibley—are not enough

26    to show a longstanding practice or custom under *Trevino*.  See MTD at 19:3-7 (citing FAC ¶ 27).

27    Second, the defendants argue that Chung's allegation about what was "well known" within the

28    district attorney's office—"that anyone who speaks out against defendant Rosen is considered an

United States District Court
Northern District of California

14

enemy of the Department, to be ostracized, physically banned from the premises, reassigned to less favorable assignments, and otherwise punished"—is also not enough to show a practice or custom. *See id*. at 19:11-28 (citing FAC ¶ 28). According to the defendants, allegations about what was "well known" were not sufficient in other cases. *See id*. (citing in part *Butler v. Cty. of Los Angeles*, No. CV-15-5228, 2018 WL 6267834, at *5 (C.D. Cal. Feb. 21, 2018)).

Chung contends that the FAC's allegations in Paragraphs 27, 28, and 36 sufficiently show a practice or custom of retaliation. Oppo. at 20:26-21:7. He argues that *Trevino* is distinguishable because it was decided on summary judgment, and that unlike the inmate who made allegations about what was "well-known" about the sheriff's department in *Butler*, as a deputy district attorney he was personally familiar with practices within the district attorney's office. *Id*. at 21:8-22:6. This knowledge, Chung argues, coupled with the allegations of at least one other former deputy district attorney punished under Rosen, sufficiently pleads a custom or practice as required under *Monell*. *See id*. at 22:1-6.

But Chung ignores the rule set forth in *Trevino*: "[l]iability for improper custom may not be predicated on isolated or sporadic incidents." *See* 99 F.3d at 918. Chung has alleged two incidents where Rosen retaliated against a deputy district attorney for his speech, involving Chung and Sibley, who was allegedly reassigned after speaking publicly about Rosen's "improper use of administrative leave hours." *See* FAC ¶ 27. The allegations about Chung and Sibley also differ significantly—the FAC only alleges that Sibley was reassigned, while Chung was twice reassigned, suspended, placed on administrative leave, and banned from County property. *See id*. ¶¶ 20-27. Even if two incidents were more than "isolated or sporadic," Chung has not pleaded two incidents indicating "practices of sufficient duration, frequency, and consistency" to show that retaliation for speech "has become a traditional method of carrying out policy." *See Trevino*, 99 F.3d at 918. Without additional factual allegations, Chung's assertion about what was "well known" within the district attorney's office is too conclusory to save his argument.

## B. Final Policymaking Authority

Defendants assert that Rosen, the District Attorney, does not have final policy-making authority over employment decisions in the Office of the District Attorney. Chung disagrees.

1    "Whether a particular official has final policy-making authority is a question of state law,"

2    determined by the judge, not the jury.  *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992);

3    *Zografos v. City & Cty. of San Francisco*, No. C-05-3881-PJH, 2006 WL 3699552, at *16 (N.D.

4    Cal. Dec. 13, 2006).  The court must first "identify the particular area or issue for which the

5    official is alleged to be the final policymaker."  *Cortez v. Cty. of Los Angeles*, 294 F.3d 1186,

6    1189 (9th Cir. 2002) (citing *McMillian v. Monroe Cty.*, 520 U.S. 781, 785 (1997)).  Next, the court

7    must "analyze state law to discern the official's actual function with respect to that particular area

8    or issue." *Id.*  In doing so, courts look to state laws, county charters and codes, and city charters.

9    *See Avenmarg v. Humboldt Cty.*, No. 19-CV-05891-RMI, 2020 WL 4464876, at *7 (N.D. Cal.

10   Aug. 4, 2020) (collecting cases).  The court cannot assume that policymaking authority "lies

11   somewhere other than where the applicable law purports to put it."  *City of St. Louis v. Praprotnik*,

12   485 U.S. 112, 126 (1988).

13   Importantly, some level of independence or discretion does not automatically transform an

14   employee into a final policymaker.  "The authority to exercise discretion while performing certain

15   functions does not make the official a final policymaker unless the decisions are final,

16   unreviewable, and not constrained by the official policies of superiors." *Zografos*, 2006 WL

17   3699552, at *16 (citing *Praprotnik*, 485 U.S. at 126-28); *see also Lopez v. City & Cty. of San

18   Francisco*, No. 12-CV-06523-MEJ, 2014 WL 2943417, at *14 (N.D. Cal. June 30, 2014) ("the

19   fact that a city employee has some level of independent decision-making power does not render

20   him a final policymaker for purposes of municipal liability").

21   The defendants contend that Rosen does not have final policymaking authority over the

22   alleged disciplinary actions taken against Chung.  MTD at 14:7-9.  They rely on certain provisions

23   within the Santa Clara County Ordinance Code and the County Charter.  *Id*. at 16:2-16:25.

24   Section A22-33 of the Ordinance Code states:

25           Subject to provisions of the Charter and this Code, the District Attorney shall have
26           power to appoint, suspend or remove all assistants, deputies, clerks and other
             employees necessary to conduct the work of the Department.

27   Defs. RJN, Ex. C.  Section A25-300 states that an "appointing authority may suspend, demote or

28

16

dismiss any employee subject to Section 708 of the Charter covering appeal rights of employees with permanent status" or those "serving on a promotional probationary capacity." *Id*. Section 708 of the Charter states that employees who are suspended, demoted, or removed may appeal those disciplinary decisions to the Personnel Board (or via an "alternate hearing procedure"). Defs. RJN, Ex. B. It further states that the Personnel Board "shall make written findings as to each charge," and that

> [t]he findings, conclusions, and decisions of the Personnel Board shall be final and conclusive and no appeal shall be taken therefrom, except that for management employees such findings, conclusions, and decisions shall be advisory to the County Executive who shall review them and make the final decision.

*Id*. If the charges against the employee are not sustained, that employee "shall be reinstated in the position immediately." *See id*.

Taken together, the defendants argue, these provisions show that "any employment decisions against plaintiff, even if attributable to DA Rosen, necessarily were not 'final' and 'unreviewable' because they were subject to review and possible alteration by the Personnel Board or an agreed alternate arbiter." MTD. at 16:22-25. Moreover, they argue, Rosen's "appointing authority does not equate to final policymaking authority," as he does not set employment policy under the county's governing law. *Id*. at 17:3-11 (citing Defs. RJN, Exs. B-C). Instead, section 704 of the County Charter—which states that the Board of Supervisors must approve, reject, or modify any adoption or amendment of merit system rules—shows that authority lies elsewhere. *See id*. at 17:3-11 (citing Defs. RJN, Ex. B).

Chung's response is two-fold. First, relying on allegations within the FAC and two Ninth Circuit cases, he argues that Rosen has final policymaking authority over administrative policies, including the appointment, suspension, and removal of employees in the district attorney's office. *See* Oppo. at 23:1-15. Next, he argues that an employee's right to appeal to the county Personnel Board is not dispositive because members of the Personnel Board are not employed by the county and do not hold county office under section 702 of the County Charter. *See id*. at 24:16-25:3 (citing Pl's. RJN, Ex. A).

Chung's arguments rely on common sense but not the law. The FAC alleges that Rosen

1    had "final policymaking authority" within the district attorney's office, and that he had the

2    "exclusive power" and "final authority" regarding appointments, suspensions, and removals of

3    employees.  *See* FAC ¶¶ 9-10.  But those allegations are belied by the County Ordinance Code and

4    County Charter.  Although these governing documents grant Rosen the authority to appoint,

5    suspend, or remove employees, they also articulate a limit to that power—that it is "[s]ubject to

6    provisions of the Charter and this Code."  *See* Defs. RJN, Ex. C.  Section 708 of the Charter

7    clearly states that employees can appeal their suspension, demotion, or removal to the Personnel

8    Board.[2]  *See id.*, Ex. D.  Put plainly, Rosen's decisions about employees are not "final,

9    unreviewable, and not constrained by the official policies of superiors."  *See Zografos*, 2006 WL

10   3699552, at *16.  Chung effectively concedes this in his opposition, stating that Rosen's decision

11   to reassign Chung "is final now because plaintiff appealed and exhausted, through arbitration, the

12   appeals process available to him under the County Charter."  Oppo. at 26:10-12.

13          Neither of the cases that Chung cites are on point.  In *Goldstein v. City of Long Beach*, 715

14   F.3d 750, 751 (9th Cir. 2013), the question was whether the district attorney acted as a local or a

15   state official when establishing policy and training—not whether he was the final policymaker.

16   And in *Botello v. Gammick*, 413 F.3d 971, 979 (9th Cir. 2005), the parties agreed that the district

17   attorney had final policymaking authority; the issue was whether he was a policymaker for the

18   state or the county when he performed administrative acts outside the scope of absolute

19   prosecutorial immunity.  These cases do not address the issue at hand: whether Rosen had final

20   policymaking authority over personnel decisions.

21          Other courts have distinguished between an official's hiring and firing authority, and their

22

23   _____

24   [2] Chung also argues that even if Rosen did not hold final policymaking authority under the law,
     the County is still liable because the County delegated such authority to Rosen.  Oppo. at 25:4-
25   25:9.  This argument is also premised on the allegation that Rosen's decisions were not "subject to
     review by the municipality's authorized policymakers" and that Rosen holds the "ultimate
26   authority over personnel"—the "sole and final say concerning the immediate transfer and
     reassignment of deputies."  *See id.* (citing in part *Christie v. Iopa*, 176 F.3d 1231, 1236-37 (9th
27   Cir. 1999).  Again, it is clear from the county's governing documents that Rosen's power is not
     absolute, as his decisions regarding an employee's suspension, demotion, or removal can be
28   appealed to the Personnel Board.  Moreover "delegating discretion"—such as discretion over
     personnel decisions—"is not equivalent to delegating final policymaking authority."  *Christie*, 176
     F.3d at 1238.

responsibility for setting employment policy.  For example, in *Gillette*, the Ninth Circuit held that a fire chief's discretionary authority to hire and fire employees, on its own, was not sufficient to establish municipal liability.  979 F.2d at 1350.  Instead, "[m]unicipal liability could be imposed on the basis of [the fire chief's] actions only if he was responsible for establishing the city's employment policy."  *Id*.  Because the city's charter and ordinances granted that authority only to the city manager and city council, the court held, they were the final policymakers for the city.  *Id*.

Similarly, in *Schiff v. City and County of San Francisco*, 816 F. Supp. 2d 798, 813 (N.D. Cal. 2011), the court held that when "an appointing officer has the authority to hire and fire workers, but not the responsibility for establishing employment policy, the personnel decisions of the appointing officer cannot be attributed to the municipality."  There, the court held that the police chief did not have final policymaking authority over promotion decisions—instead, the city and county charter made clear that the Civil Service Commission was the final policymaker regarding employment matters.  *See id*. at 812-13.

A similar distinction arises here.  The County Ordinance Code grants Rosen "power to appoint, suspend or remove" employees.  *See* Defs. RJN, Ex. C.  But that authority to hire and fire is not absolute—Rosen's decisions can be appealed and overturned.  Moreover, it appears, at least based on section 704 of the County Charter, that the Board of Supervisors sets the county's employment policy.  *See id.*, Ex. B (stating that the Board of Supervisors must approve, reject, or modify merit system rules, which include provisions of applicant examinations, classification of positions, and certain appointments).  Chung does not point to any provision within the governing documents that shows this power is vested in Rosen.  Taken together, this shows that although Rosen has some level of independent decision-making power over appointing, suspending, or removing employees from the district attorney's office, he is not the final policymaker for purposes of municipal liability.  *See Lopez*, 2014 WL 2943417, at *14.

### C.  Delegation or Ratification

A plaintiff can also show a policy or custom for the purposes of *Monell* "by showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate."  *Menotti*, 409 F.3d at 1147 (citation omitted).  "To show ratification, a

1    plaintiff must prove that the authorized policymakers approve a subordinate's decision and the

2    basis for it." *Christie*, 176 F.3d at 1239 (citation omitted).  The policymaker must know about the

3    alleged constitutional violation "and actually approve of it.  A mere failure to overrule a

4    subordinate's actions, without more, is insufficient to support a section 1983 claim." *Lytle v. Carl*,

5    382 F.3d 978, 987 (9th Cir. 2004).

6          Even if Rosen were a final policymaker under the law, Chung has not adequately alleged

7    that he ratified any of the disciplinary actions taken against him.  The FAC asserts that Rosen

8    "authorized or ratified" the following: Chung's two reassignments, two-week suspension,

9    administrative leave, and unpaid two-week suspension, along with the issuance of the "BOLO"

10   notices.  *See* FAC ¶¶ 20-25.  But beyond listing the actions allegedly taken against Chung, the

11   FAC is void of any details about Rosen's purported authorization or ratification.  It does not allege

12   that Rosen approved a subordinate's decision and the basis for it, or that he knew about the alleged

13   constitutional violation and approved it.  Instead, it makes conclusory statements that he

14   "authorized or ratified" the actions.

15         In sum, the FAC does not adequately allege a county policy, custom, or practice of

16   retaliating against district attorney employees for their speech.  Two incidents do not amount to a

17   longstanding practice or custom constituting the office's standard operating procedure.  Governing

18   law shows that while Rosen had the ability to hire and fire employees, he was not the final

19   policymaking authority in this area because those decisions were not final.  And Chung's

20   allegations that Rosen "authorized or ratified" the actions taken against him are too conclusory to

21   show that Rosen in fact ratified those decisions.

22         Because Chung has not adequately pleaded *Monell* liability against Santa Clara County,

23   the claim against the County is DISMISSED with leave to amend.

24   **IV.    INDIVIDUAL LIABILITY**

25         A supervisor may be held individually liable under section 1983 only "if there exists either

26   (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal

27   connection between the supervisor's wrongful conduct and the constitutional violation." *Keates v.*

28   *Koile*, 883 F.3d 1228, 1242-43 (9th Cir. 2018) (citations omitted).  A supervisor need not be

United States District Court
Northern District of California

20

1   directly involved in the allegedly unconstitutional conduct; he can be liable in his individual

2   capacity "for his own culpable action or inaction in the training, supervision, or control of his

3   subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a

4   reckless or callous indifference to the rights of others." *Starr v. Baca*, 652 F.3d 1202, 1208 (9th

5   Cir. 2011).

6       Chung argues that the FAC sufficiently alleges either that the retaliatory conduct against

7   Chung "was a result of Rosen's intentional acts" or Rosen's "failure to investigate and remedy the

8   unlawful retaliatory actions against" him. Oppo. at 27:7-20. He again cites to Paragraphs 20

9   through 25, which allege that Rosen "authorized or ratified" the various disciplinary actions

10  against Chung. *See id*. He also points to allegations that Rosen "acted with deliberate indifference

11  to the actions of his executive staff and others who violated Mr. Chung's rights, and failed to

12  investigate and remedy the unlawful actions of his subordinates." *Id*. (citing FAC ¶¶ 26, 36).

13      These allegations are too conclusory to show Rosen's individual liability. The FAC does

14  not state with any specificity how Rosen was involved in the alleged constitutional violation—i.e.,

15  retaliating against Chung for his speech—other than he "authorized or ratified" a series of

16  disciplinary actions that followed the publication of the op-ed. Chung argues in his opposition

17  that Rosen "either set in motion the wrongful disciplinary actions . . . or refused to investigate and

18  remedy the wrongful actions of others within his management circle." *Id*. at 27:11-12. But the

19  FAC does not allege that with sufficient specificity. Instead, it only makes conclusory allegations,

20  which are not enough for the claim against Rosen to survive.

21      However, it appears that Chung may be aware of other facts that, if added to the complaint,

22  could plausibly show that Rosen is individually liable. The opposition states that "Rosen testified

23  during the arbitration related to plaintiff that he was personally involved in multiple discussions

24  regarding plaintiff and his op-ed piece, as well as his reassignment." Oppo. at 27:16-19. Chung

25  states that these facts are "not properly before the court at this time, and not necessary for the

26  instant motion." *Id*. at 27:16-17. But they are necessary. Chung should plead what he knows

27  about Rosen's involvement and explain the basis for any conclusory allegations. Without more

28  details, Chung has not adequately alleged that Rosen was individually liable for the purported First

United States District Court
Northern District of California

Amendment violation.  The claim is therefore DISMISSED.  But because it appears that additional facts exist that could salvage the claim—at least for pleading purposes—I will grant Chung another opportunity to amend.

**CONCLUSION**

The defendants' motion to dismiss is GRANTED with leave to amend.  Any amended complaint is due within 20 days of the issuance of this Order.

**IT IS SO ORDERED.**

Dated: July 12, 2022



William H. Orrick
United States District Judge

United States District Court
Northern District of California

22